UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------x

MARIA E. SIERRA,

            Plaintiff,

            -against-

NATIONAL RAILROAD PASSENGER CORP.,

            Defendant.

------------------------------------------------------------x

No. 19-CV-05726 (CM)

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 6/28/2022
```

## MEMORANDUM ORDER AND DECISION GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

McMahon, J.:

    Plaintiff Maria E. Sierra ("Sierra" or "Plaintiff") brings a single claim under the Federal Employers Liability Act ("FELA"), 45 U.S.C. § 51 *et seq.*, against her former employer the National Railroad Passenger Corporation ("Amtrak" or "Defendant"). Plaintiff was employed as a Coach Cleaner for Amtrak's Acela trains when, during an overnight shift in July 2018, she slipped on a wet floor in an Acela bathroom and injured her knee. She seeks to recover for pain, suffering, mental anguish, loss of earnings, loss of future earning capacity, medical expenses, and future medical expenses in connection with her injury.

    Defendant answered the Complaint and the case proceeded through discovery. Following the close of discovery, Defendant moved for summary judgment pursuant to Fed. R. Civ. P. 56 and asks that this Court dismiss Plaintiff's Complaint in its entirety with prejudice. (*See* Dkt. No. 37). The motion is opposed.

    For the following reasons, Defendant's motion for summary judgment is GRANTED.

1

# FACTUAL BACKGROUND[1]

## A. The Parties

Plaintiff Maria E. Sierra is a former employee of the Defendant Amtrak.

Defendant Amtrak is common carrier by rail.

Sierra was hired as a Coach Cleaner for regular Amtrak trains beginning October 24, 2016. After one year, she transferred to work as a cleaner for the high-speed Acela train. She was employed in this capacity through the date of the slip-and-fall on July 7, 2018.

## B. The Incident

On July 6, 2018, Plaintiff started her shift at 11:00 p.m., and was scheduled to end at 7:00 a.m. on July 7, 2018. Plaintiff clocked in, attended the routine "Job Safety Briefing" before her shift and retrieved the materials for her job, which included a conventional mop and a disinfecting floor cleaner. Plaintiff then went out to the indoor location where the Acela train was kept for cleaning and began cleaning. (*See* Dkt. No. 38-7, at 58:22-23).

During Plaintiff's shift, she cleaned seven restrooms without incident. However, at approximately 5:50 am, when mopping the eighth restroom of her shift, Plaintiff slipped and fell on the wet floor and injured her knee. (Dkt. No. 44, at ¶30).

After the accident, Plaintiff submitted an Employee Injury/Illness Report and Personal Statement, in which she states she walked into the bathroom where "the floor was wet," "lost [her] balance," "HIT [her] knee" and "fell on the floor." (Dkt. No. 38-4) (emphasis in original). The only cause of the accident listed in her incident report was the wet floor. (*See* Dkt. No. 44, at ¶31).

Four days after the incident, Plaintiff gave a recorded audio statement in which she

---

[1] Unless specifically noted otherwise, the facts contained in this section are undisputed and are drawn from the parties' Rule 56.1 statement of undisputed facts and response statement. (*See* Dkt. Nos. 39, 44).

2

explained that she was mopping "quickly" and scrubbing hard to remove stains when she "stepped on the mop," which caused her to fall. (*See* Dkt. No. 44, ¶¶ 34-35). She called it a "freaky accident" and said, "I don't blame anybody." (Dkt. No. 38-23).

In her deposition, Plaintiff confirmed her prior audio statement as "accurate. I was doing my job and I fell on the floor" and that her fall was a "Freaky accident, you know." (*See* Dkt. No. 42-4, at 52:8-10; Dkt. No. 38-15, at 104:6-18). Plaintiff also confirmed in her deposition that on the day of the incident in question, she was cleaning "quickly" and "without thinking." (Dkt. No. 38-15, at 102:15-24). She explains that she cleaned the floor with a "Really wet" mop, emphasizing it was a "Wet, wet, mop" and once the floors were wet, she walked back over the wet floors with her mop and slipped. (*See* Dkt. No. 38-12, at 89:2-90:7; Dkt. No. 38-15, at 103:8-10).

By declaration in opposition to summary judgment, Plaintiff adds another possible explanation for her fall. She explains that she was "unable to obtain a purple pad [for scrubbing around the toilet] when I picked up my equipment" and the absence of the purple pad was "a factor" in her accident. (Dkt. No. 42-1, at ¶¶ 8-9). This declaration statement contradicts Plaintiff's deposition testimony where she testified that she was given a purple pad "every night" that she worked but did not *use* the purple pad on the night in question. (*See* Dkt. No. 48-2, at 52:23-54:22). Specifically, when defense counsel asked: "So . . . your supervisor the night of July 7th said you can use either the purple pad that we gave you or the mop to scrub around the toilet bowl?" Plaintiff responded, "Not only that night. They said that continuously" and explained:

> Every night when we go in we have the meeting and . . . we been given a pad almost this size (indicating), this big (indicating), and purple, and they said put the pad on the floor and scrub with your feet -- your foot around the toilet bowl where it's a lot of complaint about that. That day I was doing it with the mop. You either do it with the mop or with the pad.

(*Id.*).

There were no witnesses to Plaintiff's accident, and Plaintiff's supervisor Jorge Solano,

3

Plaintiff's Supervisor, testified that he had "no clue" why Plaintiff used a "really wet" mop and walked on the wet floor, which was contrary to standard procedure and her training, as discussed further below. (*See* Dkt. No. 42-3, at 22:6-20, 49:22-24; Dkt. No. 38-17, at 50:21-51:10).

Plaintiff admits that she was "up-to-date on her training," including safety training, on the date of the incident in question. (Dkt. No. 44, ¶ 25).

### C. Plaintiff's Training and Amtrak's Safety Materials and Procedures

Upon hiring, Plaintiff successfully completed extensive safety training including in-classroom training and hands-on training. Part of the training Plaintiff received was the "Car Cleaning and Sanitary Practices class," which included a written exam and demonstrations on how to clean coaches. (*See* Dkt. No. 44, ¶¶ 13, 15, 23). In her deposition, Plaintiff agreed she received such training and emphasized, "We have a whole month listening to what we have to do over and over and over again." (Dkt. No. 48-3, at 57:22-23). Plaintiff recalls that " . . for a month they had us from 8:00 to 3:00 sitting on the desk, in a chair, and listening, and they said you have to follow the rules . . . They showed us how to do the mopping . . ." (Dkt. No. 38-13, at 92:17-20, 93:2-3).

Defendant's evidence shows that Coach Cleaners are trained to mop restrooms with only as much liquid as required to complete the task and to start from the farthest point from the restroom entrance and mop backwards towards the entrance, so the cleaner is never standing on wet floor. (*See* Dkt. No. 44, at ¶17). While no written directive compels cleaners to clean from inside the bathroom and walk backwards, in order to avoid the wet floor (*see* Dkt. Nos. 38-25, at 95; 38-27, at 25; 38-28, at 2-4), it is undisputed that cleaners were trained to mop that way. Specifically, Sharell Johnson, Lead Coach Cleaner, testified by declaration that she personally led the hands-on training portion of the training for all Coach Cleaners, including Plaintiff, and confirmed that cleaners are taught to start in the far corner and mop backward, so as not to walk

4

on a wet floor. (*See* Dkt. No. 38-21, at ¶¶3, 9-10). Jorge Solano, Plaintiff's Supervisor, testified and affirmed that the standardized procedure for Plaintiff was to work backwards while mopping, and not to walk on the wet floor. (*See* Dkt. No. 42-3, at 22:6-20; Dkt. No. 38-17, at 50:21-51:10). Most important, Plaintiff testified at her deposition that she was told to "walk backwards" while mopping, so as not to stand on the wet floor. (Dkt. No. 48-1, at 41:22-23). Defendant also submits a PowerPoint from the Car Cleaning and Sanitary Practices class that was given to trainees; it includes photos and a brief text description of "sequence cleaning," which shows that cleaners were taught to clean from the "Inside out." (*See* Dkt. No. 38-26, at 50; *see id.* at 60). This corroborates the testimony summarized above: MTA cleaners were taught to begin mopping inside the bathroom and work their way out, precisely so that they would never have to stand on a wet floor.

Plaintiff insists that certain training materials "require[ed]" her "to walk on a wet floor" while cleaning (Dkt. No. 44, at ¶17), which she claims was unsafe. However, the materials she points to do not in fact *require* the cleaner to walk over a wet floor. (*See* Dkt. No. 38-38). Instead, the materials advise the employee to clean as follows:

> CAUTION DO NOT SOAK INTERIOR OF CARS. DO NOT ALLOW STANDING WATER. KEEP USE OF LIQUID TO MINIMUM REQUIRED TO COMPLETE TASK . . .

**Procedure**

1. Gather specialized tools and supplies necessary to perform this procedure including the following: a. Heavy duty cleaner (CRE-31) b. Long handled scrub brush c. Mop d. Bucket . . .

2. Verify proper Personal Protective Equipment (PPE) is worn prior to continuing this procedure . . .

3. If installed, remove rubber mats from the car and place on the shop floor . . .

4. Fill a bucket approximately 90% full with water; then add appropriate amount of CRE-31 per bucket size . . .

5

5. Submerge the mop into the bucket several times to absorb cleaning solution.

6. ***Wring out the mop.***

7. First concentrating on the heavily soiled areas first, mop the floor.

8. If heavily concentrated dirt or grime is not removed with the mop, scrub with the brush to remove heavy build up . . .

9. ***Rinse and re-wring the mop frequently*** to transfer dirt from the mop to the bucket.

10. When dirty, dispose of and replenish the cleaning solution in the bucket . . .

11. Clean all areas that cannot be reached with the mop by hand using a sponge or rag.

12. Repeat steps 5 through 11 in the following areas: a. Stainless steel and rubber floors; b. Inside corners; c. Moldings; d. Food service area floors; e. Rubber floor mats

(*Id.*) (emphasis added). None of these steps requires the cleaner to walk over a wet floor. And none of these written directives is inconsistent with the undisputed evidence that cleaners were taught to start in the back corner and mop backwards toward the door. To the contrary: all of these instructions (notably those that are highlighted) emphasize the importance of keeping the mop damp rather than wet.

The remaining undisputed training materials likewise repeatedly emphasize safe mopping practices, including that "When mopping/scrubbing non-carpeted floors," a cleaner was to "remove excess moisture to prevent slipping" and "not allow water to stand or puddle." (*See* Dkt. Nos. 38-25, at 95; 38-27, at 25; 38-28, at 2-4). Plaintiff also acknowledged in her deposition that it is important to "remove the water" and "Make sure that [the floor is] dry so when electrician, mechanics, supervisors that walk by no one is going to have a slip or something. . ." (*See* Dkt. No. 38-9, at 72:24-73:7). Jorge Solano, Plaintiff's Supervisor, testified and affirmed that mopping with a damp (not wet) mop, removing excess water to prevent slips-and-falls and not walking on the wet floor while cleaning was the procedure Plaintiff was expected to follow under his supervision. (*See* Dkt. No. 42-3, at 22:6-20; Dkt. No. 38-17, at 50:21-51:10; Dkt. No. 48-5, at 22:7-20).

As part of her training, Plaintiff also received standardized safety rules. The rules include that "Working safely is a condition of employment and the responsibility of every employee at all levels, regardless of position . . . If It's not Safe, Make It Safe or Don't Do It! NO JOB IS SO IMPORTANT AND NO SERVICE IS SO URGENT THAT WE CANNOT TAKE THE TIME TO PERFORM OUR WORK SAFELY." (*See* Dkt. No. 44, at ¶ 8 (emphasis in original)).

It is undisputed that Plaintiff passed the Car Cleaning and Sanitary Practices class on November 10, 2016. (*See* Dkt. No. 44, ¶¶ 13, 15, 23; *see* Dkt. No. 38-30).

As a newly hired employee, Plaintiff was then assessed by senior employees from December 9, 2016 through March 10, 2017 on her compliance with safety rules, including whether she "Observes safety rules and security procedures," "Demonstrates safe work practices" and "Reports unsafe conditions/behaviors." (Dkt. No. 38-24). Plaintiff was evaluated as meeting expectations in these areas at that time. (*Id.*). These assessments are all signed by both the foreman and general foreman for each observation. (*Id.*).

Plaintiff testified in deposition that she then received a job safety briefing "every night" that she worked and agreed that the duties expected of her were listed in the safety rules and training manuals. (*See* Dkt. No. 42-4, at 65:6-66:3).

When Plaintiff requested a transfer to cleaning the high-speed train, Acela (*see* Dkt. No. 38-7, at 59:22-23), there was no additional formal training required for that transfer. Plaintiff agreed that she did not receive any "different kind of training for [cleaning] the high-speed trains." (Dkt. No. 42-4, at 61:16-19).

Plaintiff testified in her deposition she had never previously fallen as a result of mopping and was unaware of any other employee falling as a result of mopping. (*See* Dkt. No. 38-15, at 104:6-18). There is no evidence that either Plaintiff or anyone else ever reported any unsafe

7

working conditions or cleaning practices to Amtrak.

## STANDARD

Summary judgment must be granted when there is "no genuine dispute as to any material fact and the movant[s] [are] entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *accord Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). A genuine dispute of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. At summary judgment, the movants bear the initial burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Feingold v. New York*, 366 F.3d 138, 148 (2d Cir. 2004).

Once the movants meet that burden, the non-movants may defeat summary judgment only by producing evidence of specific facts that raise a genuine issue for trial. *See* Fed. R. Civ. P. 56(c); *Anderson*, 477 U.S. at 248; *Davis v. New York*, 316 F.3d 93, 100 (2d Cir. 2002). To survive summary judgment, the non-movants must present concrete evidence and rely on more than conclusory or speculative claims. *Quinn v. Syracuse Model Neighborhood Corp.*, 613 F.2d 438, 445 (2d Cir. 1980). In assessing the record to determine whether genuine issues of material fact are in dispute, a court must resolve all ambiguities and draw all reasonable factual inferences in favor of the non-moving party. *See Parkinson v. Cozzolino*, 238 F.3d 145, 150 (2d Cir. 2001).

## DISCUSSION

### I. The Undisputed Evidence Does Not Support a FELA Claim

"FELA places a duty on railroad employers to provide their employees with a safe workplace." *Coale v. Metro-North Commuter R. Co.*, 621 Fed. Appx. 13, 15 (2d Cir. 2015) (summary order) (citing 45 U.S.C. § 51 and *Tufariello v. Long Island R.R.*, 458 F.3d 80, 87 (2d Cir.2006). That duty "'includes the duty to maintain and inspect work areas.'" *Id.* (quoting *Sinclair*

8

*v. Long Island R.R.*, 985 F.2d 74, 76 (2d Cir.1993).

However, FELA is not "a workers' compensation statute" (*see Consol. Rail. Corp. v. Gottshall*, 512 U.S. 532, 543 (1994)) or "an insurance program." *O'Hara v. Long Island R. Co.*, 665 F.2d 8, 9 (2d Cir. 1981). In order to survive summary judgment, FELA "Claimants must at least offer *some evidence* that would support a finding of negligence." *Id.* (emphasis added); *see Houser v. Norfolk Southern Railway Company*, 264 F.Supp.3d 470, 479-481 (W.D.N.Y. 2017) (granting summary judgment on FELA claim where "Plaintiff has provided no proof other than his speculative, self-serving, and self-contradictory testimony and the conclusory opinions of his expert"; "Plaintiff has failed to carry his burden of submitting 'some evidence' of negligence").

"Courts apply a more relaxed standard of both negligence and causation to FELA negligence claims than to those arising under common law." *Houser*, 264 F.Supp.3d at 479-481 (citing *Rogers v. Missouri Pac. R.R.*, 352 U.S. 500, 506 (1957)). "This does not make FELA a strict liability statute . . . But it does mean that juries have more latitude to infer negligence than at common law, such that the question can rarely be taken from them and decided by the court as a matter of law." *Id.* (citing *Williams v. Long Island R.R.*, 196 F.3d at 407 and *Ulfik v. Metro–North Commuter R.R.*, 77 F.3d 54, 58 (2d Cir.1996)).

As the negligence standard is relaxed, FELA cases often survive summary judgment. However, Defendant contends that this case presents one such a rare occasion where summary judgment is warranted as a matter of law. Amtrak argues that summary judgment should be granted because Plaintiff fails to proffer any evidence that Amtrak was on notice of the hazard giving rise to her injury or that Amtrak in any part caused her injuries.

On the undisputed record before the Court, the Court agrees with Defendant.

## A. Notice

"[A]n employer is not liable if it has no reasonable way of knowing that a potential hazard exists because, unlike some other federal statutes, the FELA was never intended to hold an employer absolutely liable for workplace injuries." *Coale*, 621 Fed. Appx. at 15 (citing *O'Hara v. Long Island Railroad Co.*, 665 F.2d 8, 9 (2d Cir.1981)). A plaintiff must thus demonstrate that the railroad "'knew or should have known of a potential hazard in the workplace, and yet failed to exercise reasonable care to inform and protect its employees.'" *Id.* at 15 (quoting *Williams v. Long Island R.R.*, 196 F.3d 402, 406 (2d Cir. 1999)); *see Gallose v. Long Island Railroad*, 878 F.2d 80, 85 (2d Cir. 1989) ("The catalyst which ignites [the employer's] duty is knowledge, either actual or constructive.").

The Second Circuit and courts in this Circuit have found that a defendant has actual or constructive notice in certain circumstances such as: where there are hazards "in plain view," *Gadsden v. Port Authority Trans-Hudson Corp.*, 140 F.3d 207, 209 (2d Cir. 1998); where the railroad admits it failed to maintain or inspect the condition in the workplace that became hazardous, *DeRienzo v. Metropolitan Transportation Authority, et al*, 237 Fed. Appx. 642, 645 (2d Cir. 2007); or where there is other testimony or documentary evidence supporting a finding of actual or constructive notice.

A plaintiff must, on a motion for summary judgment "demonstrate notice through *specific evidence* that a [railroad] employee or agent created the hazard" or "evidence that the hazard was so obvious and persistent in nature that [the railroad] can be charged with constructive notice under its duty to inspect" in order to raise a triable issue of material fact. *Coale*, 621 Fed. Appx. at 15 (summary order) (emphasis added). For example, in *Smith v. Delaware & Hudson Railway Co.*, No. 14-CV-109, 2015 WL 12556147, at *3 (N.D.N.Y. Sept. 10, 2015), the plaintiff presented

documentary and testimony evidence from an inspector, a manager, and coworkers who all witnessed the hazardous condition, as well as expert testimony, which was sufficient to support a finding that the defendant was on notice of the hazardous condition. In *Peterson v. Pan Am Railways, Inc.*, 2015 WL 2451227, at *8 (N.D.N.Y., May 21, 2015), the plaintiff provided specific evidence that he himself made a request to the defendant prior to the incident detailing the need to remedy the hazardous condition and thus sufficiently showed notice.

Here, there is simply nothing in the record indicating that Amtrak had actual or constructive notice of the "slippery conditions of the train bathrooms" or that the "methods required to clean said bathroom creat[ed] unsafe and slippery conditions." (*See* Compl. ¶10). All of Amtrak's training, materials, standards and procedures emphasize that cleaners should *not* create slippery surfaces – they should not "soak[]" surfaces, "not allow[] standing water," use only the "minimum liquid required to complete task," and frequently wring the mop while cleaning. (*See e.g.*, Dkt. No. 38-38). The standardized practices repeatedly state that "When mopping/scrubbing non-carpeted floors," a cleaner is to "remove excess moisture to prevent slipping" and "not allow water to stand or puddle." (*See* Dkt. Nos. 38-25, 38-27, 38-28). Plaintiff admits she received this training – including a month of classroom work and demonstrations on proper mopping – and was up to date on her training on the date of the incident. Plaintiff likewise testified in deposition that she recalls being trained to "walk backwards" while mopping, so as not to slip on the wet floor. Plaintiff also testified about the importance of "remov[ing] water" from surfaces and ensuring surfaces were dry to prevent slips and falls. (*See* Dkt. No. 38-9, at 72:24-73:7). Plaintiff does not identify anything that required her to mop on a wet, slippery floor.

Plaintiff herself never reported unsafe working conditions, and there is no evidence that Amtrak received complaints or reports about slippery floors, slippery working conditions or

11

training methods that created slippery conditions. There is no evidence of any other employees that have been injured while mopping.

Further, Plaintiff never identified anyone who *ever* observed her mopping with a "really wet" mop or walking on a wet floor, as was the case when the accident occurred. Although Plaintiff claims in her opposition papers that she was observed mopping while standing on a wet floor by a foreman, she does not identify this "foreman" and no record evidence corroborates any such incident. Plaintiff's Rule 26 Disclosure and discovery responses likewise identified no one who observed her cleaning in this manner; no one who has been deposed gave such evidence and no undisclosed witness could be deposed. (*See* Dkt. No. 48-6). Plaintiff's supervisor Jorge Solano, who was deposed, never observed Plaintiff mopping with an extra wet mop or walking on wet floors. And in all the assessments where she was observed (in 2016 and 2017), Plaintiff was noted as being in compliance with Amtrak's safety rules and training – which, as described above, require cleaning the floor with a damp, not wet, mop and mopping backward so as not to walk on wet floors. (*See* Dkt. No. 38-24; *see also* Dkt. No. 42-3, at 22:6-20; Dkt. No. 38-17, at 50:21-51:10).

The record evidence does not support a reasonable jury's finding that Amtrak was on notice of the hazardous condition of which Plaintiff complains.

### B. Negligence

Defendant argues that Amtrak did not play any part in Plaintiff's injuries; instead, Plaintiff's negligence was the sole cause of the injuries, which precludes a finding for Plaintiff in this action as a matter of law. (*See* Dkt. No. 40, at 16).

"FELA's language is straightforward: Railroads are made answerable in damages for an employee's 'injury or death resulting in whole or in part from [carrier] negligence.'" *CSX Transp.,*

12

*Inc. v. McBride*, 564 U.S. 685, 703 (2011) (quoting 45 U.S.C. § 51). "[A] relaxed standard of causation applies under FELA." *Id.* at 691 (quotation omitted). At the summary judgment stage, "the test of a jury case is simply whether the proofs justify with reason the conclusion that employer negligence played any part, even the slightest, in producing the injury or death for which damages are sought.'" *Id.* at 692, 700 (quotation omitted).

The Supreme Court has provided several examples of cases that are properly dismissed under FELA for failure to show causation. *Id.* at 704. One example is *Moody v. Boston and Maine Corp.*, 921 F.2d 1, 2–5 (1st Cir. 1990), in which the First Circuit affirmed summary judgment for the defendant for lack of causation where an employee "suffer[ed] stress-related heart attack after railroad forced him to work more than 12 hours with inadequate breaks." *McBride*, 564 U.S. at 704. The Supreme Court explained that in such a case, "judges would have no warrant to submit such cases to the jury" based in part on mere "'common sense' in reviewing the evidence." *Id.*

Since the Supreme Court issued such guidance, courts in this circuit have gone on to apply it to various fact patterns in cases arising under FELA. For example, in *Ortiz v. Metropolitan Transit Authority*, No. 11 Civ. 5633(GBD), 2013 WL 55990 (S.D.N.Y. Jan. 4, 2013), plaintiff was an MTA police department employee who sued the MTA under FELA after plaintiff was injured during an altercation with a disorderly person in Grand Central Station's dining concourse. *Id.* at *2. Plaintiff alleged that the MTA failed to comply with minimum staffing requirements for patrols in the Grand Central dining concourse, MTA employees failed to assist in subduing the disorderly individual, MTA failed to adequately train and warn plaintiff for dangers in her work, and MTA failed to provide reliable radios to call for backup. *Id.* at *1. Judge Daniels granted defendant MTA's motion for summary judgment notwithstanding the "'relaxed standard for negligence' in FELA cases" because, *inter alia*, (1) plaintiff failed to "produce evidence sufficient to permit a

13

reasonable jury to find that Defendant had actual or constructive notice of the potential hazard"; (2) her claims were "unsupported by the factual record" as to any inadequate training, failure to warn, or unreliable radios; and (3) plaintiff failed to establish that any of MTA's alleged failures "caused her injury." *Id.* at 3-6. As to whether inadequate training caused her injury, Judge Daniels noted, plaintiff "neither articulates any specific training by the Defendant that would have prevented her injury, nor provides any explanation as to how that additional training could have specifically resulted in a different outcome." *Id.* at *5.

This case is similar in that plaintiff has failed to proffer any evidence of negligence on the part of Amtrak or any evidence that Amtrak caused her injuries. Plaintiff identifies no additional training by Defendant that could have prevented this injury or shown that there was any lack of training or equipment that prevented her from doing her job safely. Rather, the undisputed record shows that Plaintiff's training – a "whole month listening to what we have to do over and over and over again" (Dkt. No. 48-3, at 57:22-23) – and Amtrak's written safety procedures and demonstrations of "how to do the mopping . . ." (*see* Dkt. No. 38-13, at 92:17-20, 93:2-3) emphasize not cleaning with excess water, not walking on wet floors, and taking measures to prevent slip and falls. The undisputed record demonstrates that on the day in question, in contravention of Defendant's training materials, safety materials, and procedures, Plaintiff was cleaning "quickly" and "without thinking" (Dkt. No. 38-15, at 103:11-104:10, 102:15-24), with a "Wet, wet, mop" and walking on those really wet floors when she accidentally "stepped on the mop" and fell. (Dkt. No. 44, ¶¶ 34-35; Dkt. No. 38-12, at 89:2-90:7). Plaintiff cannot escape her own testimony and the undisputed record evidence. Further, nowhere in her deposition or statements regarding the incident did Plaintiff testify that she was not provided with proper equipment on the night in question. Plaintiff's post-hoc explanation in her opposition papers that

the absence of a "purple pad" was a "factor" in her accident fails because, at her deposition, she testified that she *was* provided a purple pad but chose not to use it. (*See* Dkt. No. 48-2, at 52:23-54:22). Plaintiff cannot create a genuine issue of fact by contradicting her sworn deposition testimony in her opposition papers. *See Hayes v. N.Y. City Dep't of Corr.*, 84 F.3d 614, 619 (2d Cir. 1996). In any event, the argument is a red herring.

Plaintiff offers no evidence to suggest Amtrak caused her injury in any part and the Court agrees with Defendant that no reasonable trier of fact could find for the Plaintiff on the undisputed record. While it is unfortunate that plaintiff slipped on a wet floor and was injured in that "freaky accident," the record does not support a FELA claim.

### C. Plaintiff's Expert

Finally, Plaintiff fails to raise a triable issue of fact by the presenting the report of James R. Peduto, a managing partner at the American Institute for Cleaning Sciences, as one of an "expert witness in the cleaning and maintenance of commercial buildings." (*See* Dkt. No. 38-18, Report of James R. Peduto, dated June 25, 2021 ("Peduto Report")). Peduto's opinion is that Amtrak deviated from the standard of care when it (1) failed to provide training in compliance with the Cleaning Industry Management Standard ("CIMS"), (2) provided "conventional mops" instead of "microfiber mops" and (3) failed to use a floor cleaner. (*Id.* at 4-5).

Defendant does not move to exclude Mr. Peduto as an expert. Instead, Defendant asks that the Court find this report insufficient to raise a triable issue of fact or satisfy Plaintiff's burden of proof. Specifically, the Defendant contends that: (1) Peduto issued his report before reviewing the complete record in this case; (2) Peduto represents that he reviewed only a handful of documents and Plaintiff admits that when Peduto prepared his report, Peduto did not review Defendant's discovery responses served on October 20, 2020 and August 31, 2021, which included Plaintiff's

training materials and Amtrak's standard procedures; (3) Peduto admittedly has no experience in cleaning and maintenance of railroads or trains and is only an expert in the cleaning of buildings; (4) Peduto's opinion is contradicted by the undisputed record; and (5) Peduto admits the CIMS standard he relies on is *not* mandatory and the CIMS itself disclaims that the CIMS is not meant to "render scientific, professional, medical, legal or other advice or services . . . Any and all use of or reliance upon this Standard is at the user's own discretion and risk." (Dkt. No. 40, at 11-12). Defendant argues that Peduto's opinion, based on an incomplete record and the CIMS, which amounts to no more than a "collection of thoughts, unsupported by any real science or references to any accepted standards" (*id.* at 12), is "so thin that it does not raise a triable issue of material fact and cannot (and does not) satisfy Plaintiff's burden of proof." *Id.*

Plaintiff argues in opposition that Peduto "review[ed] all of defendant's additional documents" and "did not believe that they changed his opinion" (Dkt. No. 43, at 6); however, that uncited statement appears in the opposition brief and is not accompanied by a declaration, supplemental report, or any sworn statement from the expert to that effect. The Court thus disregards that statement. *See Melton v. Poughkeepsie City School District*, No. 16-CV-9701 (VB), 2019 WL 4640234, at *1-2 (S.D.N.Y. Sept. 24, 2019) (disregarding on summary judgment motion "the unsworn factual statements in plaintiff's submissions"). The Court only deems those statements true that are supported by evidence in the record. *See id.*

The Court agrees with the Defendant. "'[A]n expert's opinion is not a substitute for a plaintiff's obligation to provide evidence of facts that support the applicability of the expert's opinion to the case.'" *Starr International Company, Inc. v. American International Group, Inc.*, No. 05 CIV 6283(BSJ), 2008 WL 11395517, at *10 (S.D.N.Y. Jun. 23, 2008) (quoting *Upper Deck Co. v. BreaKey Int'l, BV*, 390 F.Supp.2d 355, 361 (S.D.N.Y. 2005)). "As the United States

Supreme Court [has] noted . . . , '[w]hen an expert opinion is not supported by sufficient facts to validate it in the eyes of the law, or when indisputable record facts contradict or otherwise render the opinion unreasonable, it cannot support a jury's verdict.'" *Id.* (quoting *Brooke Group v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 242 (1993)). Accordingly, courts may disregard expert testimony in deciding a motion for summary judgment where, as here, plaintiff has failed to provide evidence of facts that support the applicability of the expert's opinion to the case and/or where the expert's opinion is unsupported and contradicted by the undisputed record. *See id.*

For multiple reasons, Peduto's opinion may be properly disregarded.

As to Peduto's opinion that Amtrak failed to provide training in accordance with the CIMS, Peduto admits the CIMS is an optional, not mandatory, standard. Beyond this, Peduto is an expert in the cleaning of commercial buildings but has no expertise or background in the standards applicable to trains or railroads, and Peduto admittedly did not review the full record in this case, including highly relevant written training materials and procedures. Further, Peduto's opinion contradicts the undisputed record – including Plaintiff's own sworn testimony and admissions – which establishes that Amtrak provided standardized training, procedures, safety manuals, rules and work instructions to ensure the cleaning staff was adequately trained and equipped to do their job safely. Plaintiff admits she received this training and was briefed and up to date on her training on the date in question. Peduto's opinion that Amtrak failed to provide appropriate training is simply contrary to and unsupported by the undisputed record.

As to Peduto's opinion that Amtrak should have provided Plaintiff with a "microfiber" – not a "conventional" – mop, Amtrak argues that, as a matter of law, Amtrak was only required to provide Plaintiff with "reasonably safe and suitable" supplies in order to perform her job safely. *See Colombo v. Texas Co.*, 140 F. Supp. 496, 498 (S.D.N.Y. 1956) (citing *Jacob v. City of New*

17

*York*, 315 U.S. 752 (1942)). In its opening brief, Amtrak argues that because a conventional mop is a reasonably safe and suitable tool to perform the job of cleaning a train bathroom, Peduto's opinion that a microfiber mop is a *better* tool does not raise a material issue of fact. (Dkt. No. 40, at 14-15). Amtrak also offers Amtrak's written standards, which were developed by "[e]xperienced car cleaners and foremen," as proof that a conventional mop was a standard and accepted tool for cleaners to use. (*Id.*). In opposition, Plaintiff does not respond to Defendant's argument that a conventional mop was reasonably safe and suitable tool. Instead, Plaintiff submits a declaration that "the absence of the purple pad" – not the mop – was the relevant factor in her fall. (*See* Dkt. No. 42-1, at ¶¶ 8-9). Because Plaintiff does not respond to Defendant's argument and maintains that her fall was caused by the absence of a purple pad (which for reasons discussed *supra*, at pages 14-15, is unavailing), the mop theory is abandoned, and Defendant's point conceded. *See Pincover v. J.P. Morgan Chase Bank, N.A.*, --- F.Supp.3d ----, 2022 WL 864246, at *11 (S.D.N.Y. Mar. 22, 2022). Peduto's opinion regarding microfiber mops is thus irrelevant and inapplicable.

Finally, as to Peduto's opinion that the Defendant deviated from the standard of care because it failed to use a "floor cleaner," this opinion directly contradicts the undisputed record. Peduto claims that Defendant only gave Plaintiff a "deodorizer" instead of a "floor cleaner" and Peduto reasons that because Plaintiff did not have a disinfecting "floor cleaner," she had to scrub harder to remove dirt, which caused her to fall. However, Plaintiff testified in her deposition that "every night" she worked she was given a floor cleaner, specifically "soap with disinfectant" (*see* Dkt. No. 42-4, at 66:17-18), and Amtrak's cleaning standards confirm that cleaners are to be supplied with "floor cleaner" *and* "CIE-12 Disinfectant (Avanflex)." (*See* Dkt. No. 38-29). Peduto's opinion is irrelevant since the undisputed evidence, including Plaintiff's own testimony, shows that Plaintiff was provided with a floor cleaner.

Peduto's opinion, which contradicts or is unsupported by the record, is disregarded.

## CONCLUSION

For the reasons discussed above, Defendant's motion for summary judgment is GRANTED and the Complaint is dismissed with prejudice.

This constitutes the decision and order of the Court. It is a written opinion.

The Clerk of Court is respectfully directed to terminate the motion at Docket Number 37 and close the case.

Dated: June 28, 2022

_____
U.S.D.J.

BY ECF TO ALL COUNSEL